UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

JOHN GRENIER,                          :
          Plaintiff,                   :
                                       :    Docket No. 1:09-cv-121-jgm
          v.                           :
                                       :
DETECTIVE-SERGEANT INGRID JONAS,       :
                                       :
          Defendant.                   :
                                       :
_____ :

MEMORANDUM AND ORDER
(Doc. 59)

Defendant Detective Sergeant Ingrid Jonas, through the Vermont Attorney General,

moves for summary judgment on Plaintiff's 42 U.S.C. § 1983 claim that Jonas withheld material

exculpatory or impeaching evidence favorable to Plaintiff, prolonging his pre-trial detention in

violation of his constitutional rights.  Defendant also argues she is entitled to qualified immunity

because she acted with objective reasonableness.  For the reasons that follow, the motion for

summary judgment is denied.

I.    Background

Detective Jonas has been a Vermont State Police officer since 1998.  (Jonas Aff. ¶¶ 1-2,

Doc. 59-2.)  It is undisputed that the year she joined the force, she completed a sixteen-week

basic training course, comprising a 54-hour course in criminal law, in which she was instructed

regarding a law enforcement officer's obligation to disclose all relevant evidence to a prosecutor,

including exculpatory evidence.  Id.  In 2007, Detective Jonas worked with the Northwest Unit

for Special Investigations investigating claims of sexual abuse.  Id. at ¶ 3.

On November 26, 2007, a nurse at the Richford Health Center telephoned Detective Jonas at the Northwest Unit to report that a developmentally disabled adult female had sought treatment for mild food poisoning, and when asked if she could be pregnant, described a sexual assault that had occurred a few weeks prior.  Id.  Detective Jonas took the complainant's statement three days later.  The complainant, identified as "S.S.," told Jonas she had learning disabilities, did not know whether she was pregnant, and the last time she had sex was in October, with a man named "John," whose cousin lived in her building.  Id. at ¶¶ 5-6.  John was later identified as Plaintiff John Grenier.  S.S. described a sexual encounter in which Grenier knocked on her door, said "Travis sent me up here to um fuck you for $20," told her to "[t]ake your underwears – your pants and underwears off," placed his penis in her mouth and then had vaginal intercourse with her.  Id. at ¶ 7.  S.S. told Jonas Grenier appeared drunk, that she followed his directions throughout the encounter because she "didn't want to get in a domestic assault," as had happened with other men, and she felt Grenier had taken advantage of her learning disability.  Id. at ¶¶ 7-8.  In her account, there is no indication she told Grenier she did not consent to the encounter or the intercourse, or that she resisted in any way.  S.S. stated Grenier left her $20.  (S.S. Interview Tr. at 37, Doc. 59-4.)

Detective Jonas then recorded an interview with Mr. Grenier, pursuant to a warrant, in which Grenier repeatedly denied having intercourse and stated "there was no intercourse sex." (Grenier Interview Tr. at 9, Doc. 59-5.)  He said S.S. told him she wanted $20 for a blow job, and he was aware, because his cousin had told him, that S.S. "sleeps around for money," and a lot of people went to her apartment.  (Id. at 11, 14.)  Grenier then repeated, S.S. "wanted $20 for a blow

job. . . . Okay? And then she wanted more money." Id. at 30. He denied forcing S.S. to do anything. Id. at 23-24.

On December 3, 2007, Detective Jonas interviewed S.S.'s neighbor, Travis Denton, Mr. Grenier's cousin. Denton said the evening of the alleged incident, Grenier had come to invite him to camp, and Denton declined. (Denton Interview Tr. at 8, Doc. 59-6.) The day after the alleged incident, S.S. came to Denton's door. Id. She told him Grenier had come to her apartment the previous evening, and Grenier had claimed he had done so at Denton's urging. She said Grenier had "pushed her down" and had sex with her, and then gave her $20. Id. at 9, 10, 12. Denton also said S.S. "[s]eemed like she wanted more money" from Grenier and he later communicated this to Grenier. Id. at 16. Denton told Detective Jonas that in his subsequent conversation with Grenier, Grenier had denied having sex with S.S., but admitted that when he was outdoors, she had asked him for $20 in exchange for oral sex, and he admitted giving her $20 for oral sex. Id. at 10. Denton also stated S.S.'s family refused to help her because she had been sentenced, as Jonas put it, for "doing something" to "her relatives' kids," and that her husband, who was a pedophile, reportedly had prostituted her while he was in prison. (Id. at 13, 15.) Denton denied telling Grenier he could go to S.S.'s apartment and offer $20 for sex. Id. at 24.

That same day, Jonas also interviewed Brenda Goodhue, a storekeeper from the store on the ground floor of the same building, who was familiar with S.S. and had helped S.S. transition from the street to the apartment where the alleged assault took place. (See Goodhue Interview Tr., Doc. 59-8.) Goodhue informed Jonas that S.S. "can tell the truth. [S.S.] can lie." Id. at 4. Goodhue explained, "She would tell me one thing and then an hour or two later, it was a whole

different story. . . . So I don't know what her - - I think she's been abused a lot in her lifetime. . . . And she doesn't know the truth and a lie." Id. at 5.  Goodhue stated S.S. told her "two different stories" regarding the incident, at first recounting that she performed oral sex on Grenier but did not take the $20, and then an hour or so later stating they had intercourse and that she spent the $20 Grenier left behind.  Id. at 6-7.

At some point early in the investigation, Detective Jonas checked certain databases for both S.S.'s and Grenier's criminal records.  While she did not run either Grenier or S.S. through Burlington Police databases, Jonas testified she searched for S.S.'s records in Spillman and NCIC[1] police records databases and learned something regarding Grenier's record through the Spillman search.  (Jonas Depo. at 21:12-22:17, Doc. 71-2.)  Plaintiff, to date, has been unable to determine through discovery precisely what the searched databases revealed at the time, but the transcript of Jonas' recorded interview with Mr. Denton reveals she was aware S.S. (who in fact had a lengthy criminal history) had been convicted "for doing something" to "her relatives' kids." (Denton Interview. Tr. at 15, Doc. 59-6.)  It also reveals she informed Denton that Grenier had been convicted twice for lewd and lascivious conduct and was a registered sex offender.  Id. at 32-33.  In her deposition, Jonas states she was aware from her early searches that S.S. was an arson offender, a domestic violence offender, maybe a sex offender, and a domestic violence victim.  (Jonas Depo. at 22:1-4, Doc. 71-2.)  Jonas stated her early searches did not reveal the SIU division was not taking, or prosecuting, any of S.S.'s cases.  Id. at 22.

---

[1] Spillman is a Vermont police database containing information regarding police contacts, i.e., individuals involved in motor vehicle stops or reports, or individuals who have been either victims of, or accused of, crimes.  NCIC contains records of convictions.  (Doc. 77 at 2.)

On December 3, 2007, Grenier was taken into custody and charged with sexual abuse of a vulnerable adult.  He was arraigned the following day and held without bail.  On December 18, 2007, the prosecution amended the charge to include sexual assault, and Grenier was again arraigned on December 20, 2007, and remained held without bail.

On December 21, 2007, Detective Jonas interviewed Elaine Forsythe of Adult Protective Services in an attempt to locate S.S.  Ms. Forsythe was an investigator who had worked with S.S. "over the course of many years."  (Jonas Depo. at 212, Doc. 71-2.)  In her deposition, Jonas testified that at the time of the December 21 interview, Ms. Forsythe knew about S.S's record and "knew a lot things about [S.S.]."  Id. at 212-13.  Jonas also testified she specifically asked Ms. Forsythe about S.S.'s credibility and "if [S.S.] had been known to make false reports."  Id. at 213.  She requested that Adult Protective Services produce S.S.'s records.  Id.  Jonas testified she could not remember exactly what Ms. Forsythe told her at the time and that she "knew the witnesses didn't think that [S.S.] was raped."  Id. at 213, 215.

A Chittenden Unit for Special Investigations report, regarding a September 2007 sexual assault allegation S.S. made against another individual, states the investigator interviewed Forsythe on September 24, September 27, and October 1, 2007.  (Chittenden Unit for Special Investigations, Supplementary Investigation Report, Doc. 71-3.)  The report reflects S.S. claimed she was assaulted and taken advantage of because she was disabled, but stated she did not tell the accused to stop, nor did she say "no" to the sexual contact.  Id. at 5, Doc. 71-3 at 6.  The report states Forsythe, who was familiar with S.S., told the investigating officer S.S. "had fabricated incidents in the past," and most reports "involve some type of sex and then her misinterpretation of what occurred."  Id. at 10.  Furthermore, Forsythe advised she was "hesitant to have [officers]

5

charge her with False Information because [S.S.] is in dire need of services." Id.  The report also notes Forsythe stated she did not believe S.S. was "intentionally lying, but based on her intellectual ability, [was] putting herself in bad situations," and although S.S. reported she was pregnant, S.S. could not get pregnant because of a recent medical operation.  Id. at 8, 10. Forsythe also told the investigator S.S.'s unwillingness to undergo a SANE kit to confirm the alleged assault could reflect S.S.'s knowledge, based on past experience with prior reported assaults, that a SANE kit would not reveal any evidence if she had not been assaulted.  Id.

On December 23, 2007, Detective Jonas left for a trip out of state and returned on January 2, 2008.  (Jonas Aff. at ¶ 25, Doc. 59-2.)

One evening at 9:00 p.m., in either the first or second week of January 2008, S.S. left a message for Jonas in the general voicemail system for Northwest Unit for Special Investigations.

The voicemail stated: "Hello Ingrid Jones.  This is [S.S.] calling and I'm reporting another incident, because I didn't say nothin' because Travis Denton was still there and he sexually assaulted me day after John did.  And he's living at two, three River Street, apartment two, Richford Vermont 05476 and I'm not in Richford anymore.  Bye."  Id. at ¶¶ 26-27.

On January 10, 2008, Jonas learned S.S. had informed her landlord she was living in the Burlington area.  Id. at ¶ 30.  Jonas contacted the Burlington Police Department and a Legal Aid attorney familiar with S.S. to request assistance in locating her.  Id.  The Legal Aid attorney was able to arrange a meeting between Jonas and S.S. on January 24, 2008, but Jonas claims she was unable to question her regarding the alleged second assault because they were in a public place. Id. at ¶ 32.

On or about January 17, 2008, Jonas forwarded the voicemail message to Kelly Woodward, a Victim's Advocate.  Ms. Woodward later forwarded the message back to Jonas. Jonas made a recording of the message after it was sent back go her.  Id. at ¶ 29.

On January 29, 2008 Jonas obtained S.S.'s records from the Burlington Police Department and the Chittenden Unit for Special investigations.  Id. at ¶ 33.  Those records were then turned over to the State's Attorney's Office on or about February 1, 2008.  Id.

On February 13, 2008, Jonas turned S.S.'s voicemail message over to the Deputy State's Attorney.  Id. at ¶ 34.  The prosecutor promptly scheduled a bail hearing.

At the bail hearing on February 15, 2008, the prosecutor advised the court of the voicemail message, characterized it as exculpatory, stated S.S. had in the past made false rape allegations in situations where the allegations were "physically impossible," that S.S.'s history of claims was "such that the Chittenden County State's Attorney's office will not investigate any of her claims," and agreed to release Mr. Grenier on conditions.  (Bail Hr'g Tr. at 5, 13, Doc. 59-9.) On March 19, 2008, the charges against Mr. Grenier were dismissed without prejudice.  (Def.'s Undisputed Mat. Facts at ¶ 38, Doc. 59-1.)

This lawsuit followed.  Detective Jones moved to dismiss the complaint, and this Court denied the motion, noting Plaintiff had stated a claim under Russo v. City of Bridgeport, 479 F.3d 196 (2d Cir. 2007), but stating its conclusions may change at the summary judgment stage. (Doc. 17 at 18.)

## II.   Summary Judgment Standard

Federal Rule of Civil Procedure 56(c) provides summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no

genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  On a motion for summary judgment, the facts are viewed in the light most favorable to the non-movant.  Williams v. R.H. Donnelley, Corp., 368 F.3d 123, 126 (2d Cir. 2004).  The burden of demonstrating the absence of any genuine dispute of material fact rests on the party seeking summary judgment.  Pietrangelo v. Alvas Corp., 664 F. Supp. 2d 420, 432 (D. Vt. 2009).

III.    Discussion

    A.    Fourth Amendment Claim Based on Grenier's Prolonged Pre-Trial Detention

Because there are genuine issues of material fact regarding Grenier's claim, Detective Jonas has failed to demonstrate she is entitled to summary judgment as a matter of law.

Plaintiff Grenier asserts a § 1983 claim that his pre-trial detention was unreasonably prolonged by Detective Jonas' failure to turn exculpatory evidence over to prosecutors and therefore violated his Fourth Amendment right to be free from unreasonable seizure.  To succeed on such a claim, a plaintiff "must establish (1) that he has a right to be free from continued detention stemming from law enforcement officials' mishandling or suppression of exculpatory evidence, (2) that the actions of the officers violated that right, and (3) that the officers' conduct 'shocks the conscience.'"  Russo v. City of Bridgeport, 479 F.3d 196, 205 (2d Cir. 2007) (recognizing the right was properly analyzed under the Fourth Amendment).  In Russo, the Second Circuit denied certain defendants summary judgment on a plaintiff's § 1983 claim that his pre-trial detention was unreasonably delayed by law enforcement's failure to timely view and turn over an exculpatory video of a robbery.  Id.  In assessing whether there was a constitutional encroachment, the Russo court considered the following factors: the duration of the wrongful

incarceration, the ease with which the exculpatory evidence could have been checked, and the intentionality of the officer's behavior.  Id. at 209.  It held that even a 68-day portion of Russo's 217-day detention was plainly and sufficiently prolonged and thus supported a constitutional claim.  Id. (noting, in contrast, that the Supreme Court in Baker v. McCollan, 443 U.S. 137, 145 (1979), found brevity of a three-day detention relevant in denying a similar claim).  Furthermore, the Court found Russo's claim of innocence and misidentification was readily verifiable by viewing a videotape of the robbery, and there was sufficient evidence of affirmative wrongdoing and intentional conduct to put the question of whether that conduct "shocked the conscience" to the jury.  Id. at 210.

Here, construing the evidence in a light most favorable to Grenier, this Court finds there are material facts in dispute, and sufficient evidence in the record to establish the elements essential to his claim and survive summary judgment.

Grenier alleges his pre-trial detention was prolonged by Detective Jonas's mishandling or suppression of exculpatory evidence, namely, S.S.'s voicemail.  Detective Jonas disputes that the voicemail was exculpatory or that it was mishandled, and argues the voicemail, taken alone, could not have resulted in the termination of Grenier's pre-trial detention, and only became relevant in combination with the official Burlington police records detailing S.S.'s past fabricated allegations.

There is sufficient evidence the voicemail was exculpatory in light of the information likely known to Detective Jonas, and, in the circumstances presented in this case, should have been turned over to the prosecution when it was received, regardless of whether the truth of its contents was readily verifiable or not.  Therefore, a reasonable jury could find Jonas mishandled

it.  While it is true the voicemail did not on its face speak to whether Mr. Grenier had or had not committed the act with which he was charged, given the information known about the complainant, it seriously undermined her credibility and therefore called his guilt into question. There is sufficient evidence, direct and circumstantial, in this summary judgment record to permit a jury to find or infer Detective Jonas knew S.S. had made false rape accusations in the past, and that the existence of a second accusation was material to the question of his guilt.

Jonas had spoken to Elaine Forsythe of Adult Protective Services and testified she specifically asked Forsythe about S.S.'s credibility and whether she "had been known to make false reports."  (Jonas Dep. at 213, Doc. 71-2.)  Ms. Forsythe, who had worked with S.S. over the course of many years, had just a few months prior advised other law enforcement in at least three different interviews that S.S. had made false sexual assault accusations in the past.  Even though Detective Jonas has testified that she cannot recall Ms. Forsythe's response to her inquiry, and even though a jury may credit her testimony that she could not recall Forsythe's response at the time of her deposition, a reasonable jury could also infer, from these facts, that Ms. Forsythe was forthcoming with Detective Jonas regarding S.S.'s past false allegations, because Forsythe had several years' experience with S.S. and had recently reported the same information to other investigators.

At minimum, the voicemail indicated S.S. was contradicting her earlier statements to both the nurse and Detective Jonas that John Grenier was the last man with whom she had intercourse. Because there is direct and circumstantial evidence S.S.'s credibility had been called into question both by witnesses Jonas interviewed and by Adult Protective Services at the time S.S.'s voicemail was received, and the voicemail represented, at minimum, significant impeachment evidence,

10

undermining the veracity of S.S.'s accusation against Grenier and calling his guilt into question, there is sufficient evidence it should have been turned over when it was received.

Defendant's argument that the delay in releasing the voicemail did not prolong Grenier's incarceration because she did not receive Burlington Police records until late January also does not mandate a grant of summary judgment. While the documentary evidence of the false accusations did not arrive until a later date, a prosecutor informed of the voicemail and the witnesses interviews undermining S.S.'s credibility could have confirmed that information by calling Ms. Forsythe, even while awaiting receipt of the Burlington Police records. Furthermore, even without the police records, a prosecutor could determine the voicemail at minimum contradicted two of her earlier statements to a health-care worker and to law enforcement.

Grenier's pre-trial detention was sufficiently prolonged to support a constitutional claim. The record reflects Detective Jonas received the voicemail sometime in the first two weeks of January. (Jonas Aff. at ¶ 26, Doc. 59-2.) Grenier's incarceration ended February 15, 2008, when he was released on bail. The approximate period of alleged wrongful incarceration therefore lasted between five and seven weeks, or between 35 and 49 days. The shorter 35-day detention period is almost twelve times the three-day detention the Supreme Court in Baker found was insufficiently prolonged to state a constitutional claim. The duration of Grenier's alleged wrongful incarceration is sufficient to support a constitutional claim.

Whether Detective Jonas' failure to turn over the voicemail "shocks the conscience" turns in large part on the intentionality of her failure, and this, in turn, depends on a jury's assessment of both Jonas' testimony and the weight it would give evidence that S.S.'s credibility was in doubt when Jonas received the voicemail. Defendant argues the failure to turn over the voicemail does

11

not shock the conscience because she was working to follow-up on the voicemail and had difficulty doing so.  While this may be true, if Jonas had reason to believe S.S. was not credible, had made contradictory statements, or had previously made false allegations of rape, the voicemail should have been turned over to the prosecutor promptly, because a subsequent allegation of rape under these circumstances undermined the credibility of the complainant's first allegation, and turning over the voicemail would not impede her investigation.  Although the Court acknowledges there is sparse direct evidence of Detective Jonas's intentional conduct in delaying the transmittal of the voicemail recording, there are sufficient questions of fact, and questions of credibility and weight to be given the evidence, to withstand summary judgment.

B. <u>Qualified Immunity</u>

Detective Jones claims she is entitled to qualified immunity because her actions were objectively reasonable.  While the qualified immunity doctrine's purpose is to protect state actors from burdensome litigation by providing immunity from insubstantial suits, where a court has determined the record presents genuine issues of fact for trial, and resolution of those factual issues bears on the availability of the defense, summary judgment on grounds of qualified immunity is inappropriate.  <u>Lennon v. Miller</u>, 66 F.3d 416, 422 (2d Cir. 1995) (noting denial of summary judgment based on determination that factual findings were essential to qualified immunity question was not reviewable under collateral order doctrine); <u>see also</u> <u>Johnson v. Jones</u>, 515 U.S. 304 (1995) (finding determination that summary judgment record raised issues of facts regarding officers' involvement in beating of § 1983 claimant was not reviewable, as opposed to qualified immunity decisions based on pure questions of law).  Here, there is a genuine issue of material fact regarding what facts were known to Detective Jonas at the time she received S.S.'s

voicemail.  Jonas' knowledge bears directly on whether it was objectively reasonable to fail to promptly forward S.S.'s voicemail to the prosecution.  While summary judgment on a qualified immunity defense is appropriate where facts bearing on the availability of the defense are not in dispute, here certain jury findings are essential to resolving the question.  Whether S.S.'s voicemail should have been immediately recognized as materially exculpatory turns, in part, on what Jonas knew about S.S.'s history of making false allegations.

IV.    Conclusion

Therefore, Defendant's Motion for Summary Judgment (Doc. 59) is DENIED.

SO ORDERED.

Dated at Brattleboro, in the District of Vermont, this 17th day of November, 2011.


/s/ J. Garvan Murtha_____
Honorable J. Garvan Murtha
United States District Judge